OPINION OF THE COURT
Beverly S. Cohen, J.
Plaintiff adoptive parents move for an order pursuant to CPLR 3124 compelling defendant adoption agency to respond to plaintiffs’ interrogatories, which seek background information about the natural mother of plaintiffs’ adopted son and the events and circumstances surrounding the adoption.
Defendant opposes disclosure on the basis plaintiffs have not shown good cause for the release of sealed adoption records because they have not proven that the information sought is required for the health and well-being of the adoptee. Defendant contends that "the simple reason that the adoptive-parent/litigant believes the information would buttress a claim for money damages” does not constitute "good cause.”
Plaintiffs’ complaint, grounded in claims of fraud and misrepresentation, alleges a cause of action for wrongful adoption, a young tort that does not appear to have been raised in New York before, but has been recognized in other jurisdictions.
FACTUAL BACKGROUND
On May 13, 1966, plaintiffs adopted an infant born January 5, 1965, whom they named Michael Lloyd, through defendant Louise Wise Services, a private not-for-profit adoption agency. Michael, who is now 28, has had a history of psychological disorders for which he has been hospitalized on several occasions. He is currently being treated by a psychiatrist for "certain mental illnesses, including schizophrenia.”
According to defendant’s records at the time of Michael’s adoption, plaintiffs were told by defendant that Michael’s mother "was along in her 30’s * * * did not have a very good relationship with her mother[, had] won a scholarship to a *316 well known college and finished two years of it. The mother had been going out with someone seriously, but he died suddenly of a heart attack and so she could not marry him. She became pregnant quite soon after. She said that if her boyfriend had not died she would not have become pregnant. This shock led to some emotional difficulty and she later sought professional help for it. The baby’s father was white Jewish, but in character was not one of lasting quality”. In contrast, plaintiffs allege that they have learned through Michael’s own investigation the biological mother’s name and some of her medical and psychological history, including the fact that she had a frontal lobotomy before giving birth to Michael.
Contending that they would not have adopted Michael if they had been apprised of the true facts about his mother, plaintiffs brought this action against defendant seeking to recover the very large sums of money they have expended for Michael’s medical treatment. The motion now before the court seeks to compel defendant’s full compliance with interrogatories served by plaintiff, which defendant only partially answered, stating that the bulk of the information could not be supplied because it would involve an impermissible disclosure of sealed adoption records.
In support of the motion, plaintiffs submit an affidavit from the psychiatrist who is currently treating Michael which advocates disclosure because knowledge of a patient’s family history "is significant in determining treatment and in diagnosing or ruling out other mental illnesses.” In addition, Michael himself supports his parents’ motion, both on their behalf and on his own. He has submitted an affidavit stating that he learned his natural mother’s identity with the help of the Adoptees Liberty Movement Association and public records, and was able to locate her brother. Michael then contacted that brother, spoke with him at length, and learned that the woman he believes to be his natural mother has a long history of mental illness and had "had a lobotomy long before [his] birth.” Michael also states that he has "run up medical, hospital, pharmaceutical and counseling expenses which are approaching Two Million Dollars.” Michael’s uncle has not participated in these proceedings.
WRONGFUL ADOPTION TORT
This court finds that the public policy interest mandates *317 the extension of common-law fraud principles to the adoption setting and that plaintiffs have stated a cognizable cause of action.
Adoption of children has been practiced in all societies. In the 140 years since adoption was created by statute, in our State it has continued to provide a way of building families and promoting the welfare of children whose biological parents could not or would not care for them. In more recent times, the concept of illegitimacy has largely lost its stigma for both the child and the biological mother. The combination of these two factors has resulted in the rise of advocacy groups for natural parents, adoptees and adoptive parents. These groups have brought to light problem areas in the adoption process and sensitized both legislators and jurists to the particular needs of the constituencies involved. Confidentiality and disclosure laws were passed, subsidy programs were funded to promote adoption of children with special needs, and judicial remedies were devised to correct wrongs perpetrated in the context of adoption.
One such wrong recently begun to be addressed by the courts is the fraudulent concealment by intermediaries (adoption agencies or lawyers and doctors who effect private adoptions) of material facts about a child or her biological family— usually a hereditary physical or mental condition — which, if disclosed to the prospective adoptive parents, would have resulted in the adoption not taking place. When the concealed fact comes to light after the adoption, one of two things happens: either the adoptive parents seek to rescind the adoption and everyone is hurt, or they keep the child and live with the consequences, which frequently entail less than optimal treatment for the child and extraordinary and onerous expenses for the parents. To provide redress in the second instance, which is the situation alleged by the plaintiffs in this case, some courts have fashioned the tort of wrongful adoption.*
The tort of wrongful adoption first appeared in Ohio in 1986 *318 in Burr v Board of County Commrs. (23 Ohio St 3d 69, 491 NE2d 1101), a case where the adoption agency misrepresented the physical condition of a child who was later diagnosed with Huntington’s disease and told the prospective parents the natural mother was 18 years old and lived with her parents when in reality she was 31 years old and confined to a State mental hospital. The court held that to establish a cause of action for wrongful adoption, the plaintiffs had to prove all the elements of the tort of fraud. In the situation presented, the Burr court found plaintiffs had met that burden by showing that "[the agency] knew the history was false, intended reliance, and in fact misled [plaintiffs] to their detriment” because if told the true story they would not have adopted the child and incurred all the medical expenses they had (supra, 23 Ohio St 3d, at 73, 491 NE2d, at 1106). The court stressed that the suit was
"premised not on injuries resulting from [the agency’s] official policy of silence, but rather on [their] active and knowing misrepresentation of fact. * * *
"In no way do we imply that adoption agencies are guarantors of their placements * * * However, just as couples must weigh the risks of becoming natural parents, taking into consideration a host of factors, so too should adoptive parents be allowed to make their decision in an intelligent manner. It is not the mere failure to disclose the risks inherent in this child’s background which we hold to be actionable. Rather, it is the deliberate act of misinforming this couple which deprived them of their right to make a sound parenting decision and which led to the compensable injuries” (23 Ohio St 3d, at 77-78, 491 NE2d, at 1108-1109).
As the tort was recognized in other States, its elements and limitations became more defined.
In Michael J. v Los Angeles County Dept. of Adoptions (201 Cal App 3d 859, 247 Cal Rptr 504 [1988]), a California case where the adoption occurred four years before the State enacted a disclosure statute, the court found that the agency was liable to the adoptive parents for nondisclosure of a medical condition of the child that should have been diagnosed at birth but was not. The court based its findings on public policy: "Public policy cannot extend to condone concealment or intentional misrepresentation which misleads prospective adoptive parents about the unusual calamity they are assuming. The adoption of a child is an act of compassion, love *319 and humanitarian concern where the adoptive parent voluntarily assumes enormous legal, moral, social and financial obligations. Accordingly, a trustworthy process benefits society, as well as the child and parent. As keepers of the conscience of the community, we cannot countenance conduct which would allow persons who desire entrance into the emotional realm of parenting to be unprotected from schemes or tactics designed to discharge societal burdens onto the unsuspecting or unwary. As trustees of the child’s destiny the agency was obligated to act with morals greater than those found in a purveyor’s common marketplace” (201 Cal App 3d, at 871, 247 Cal Rptr, at 513).
In Roe v Catholic Charities (225 I11 App 3d 519, 588 NE2d 354 [1992]), the court found that the lack of a statute requiring disclosure at the time of the adoption did not condone the agency’s intentional misrepresentation (255 I11 App 3d, at 530, 588 NE2d, at 360). It also recognized a cause of action based on negligent misrepresentation for an agency’s failure to provide adequate information when it had a duty to do so (255 I11 App 3d, at 531, 588 NE2d, at 361).
In recognizing wrongful adoption in Wisconsin, the court determined that for Statute of Limitations purposes the cause of action accrued not when the plaintiffs merely learned of the misrepresentation but when they incurred damages because of it, and limited plaintiffs’ recovery to the extraordinary medical expenses they would incur, as a result of the agency’s negligent misrepresentation (Meracle v Children’s Serv. Socy., 149 Wis 2d 19, 437 NW2d 532 [1989]).
New York’s "vital social interest in the welfare of its children is one of its strongest public policies” (Barry E. v Ingraham, 43 NY2d 87, 94). Adoption, which advances such interest, is to be encouraged; indeed, public policy so favors adoption that only lack of jurisdiction or fraud will cause a court to set aside an order of adoption. Thus, "the unassailable and overriding consideration in any adoption proceeding remains the best interest of the child” (Matter of George L. v Commissioner of Fulton County Dept. of Social Servs., 194 AD2d 955, 956 [3d Dept 1993]).
The State’s interest is even more pronounced when dealing with special needs children. If a child awaiting adoption has special physical or psychological needs, the State has an interest in ensuring that the placement will be such that the child’s needs will be fully met. In furtherance of this goal, *320 Federal and State programs providing subsidies to adoptive parents of special needs children have been established (see, e.g., Adoption Assistance Act, 42 USC § 673). To qualify for these subsidies, most programs require the prospective parents to apply before the adoption is finalized. When the agency withholds the information that the child has special needs, generally to increase his chances of adoption, special protection will be lost to the child and public policy vitiated.
If new torts need to be created to further the State’s public policy in protecting its children, the State’s trial courts should lead the way (cf., Minot v Eckard-Minot, 13 F3d 590 [2d Cir], affg Minot v Eckard-Minot, 1993 WL 106043 [SD NY, Apr. 6, 1993, Mukasey, J.]).
Based on the cases cited above and the public policy of this State, this court holds that it is possible for plaintiffs to allege a cause of action for wrongful adoption. In recognizing such tort, this court, as did the Illinois court, stresses that "Recognition of this cause of action is not a dramatic, radicál departure from the well-established common law of the State * * * It is rather an extension of the doctrine of common law fraud. This is how the common law grows; it responds to the needs of the society it serves” (Roe v Catholic Charities, supra, 255 Ill App 3d, at 524, 588 NE2d, at 357).
In order to make out a prima facie case for fraud under New York law, a plaintiff must establish that: (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendants intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss (Channel Master Corp. v Aluminum Ltd. Sales, 4 NY2d 403). If plaintiffs prove these elements at trial, they can succeed in their suit. As they have a cognizable cause of action, they are entitled to the disclosure sought subject to the following procedural guidelines.
DISCLOSURE OF RECORDS
Plaintiffs argue they "require the requested information to prove defendant’s fraudulent conduct and for [the] adoptee’s mental health and well being.” They contend that defendant is attempting to cloak its fraud with a mantle of confidentiality designed to shield only adoptees and natural parents, and the natural mother’s interests will not be affected by disclosure because they already know her identity.
*321 The confidentiality of adoption records has long been a controversial and sensitive subject. Attempts to strike the proper balance between the interests of biological parents, adopted children and adoptive parents have led to an evaluation in the laws governing disclosure that is still going on today. With each change, the issues become more defined, new problems emerge, and new solutions are sought.
Confidentiality of adoption records protecting the privacy interests of natural parents, adoptees and adoptive parents was imposed to further the State’s "broader sociological plan to provide a child with a substitute family through the adoption process” (Matter of Anonymous, 92 Misc 2d 224, 225). Mandatory disclosure of nonidentifying medical information has been deemed the best way to protect those interests while meeting the adoptee’s need to know her medical background (Nugent, The Release of Nonidentifying Information to Adopted Children: Striking a Balance Between the Rights of Biological Parents and Adopted, Children, 23 Rutgers LJ 709 [1992]).
In 1983, New York enacted legislation requiring disclosure of the information that plaintiffs contend was wrongfully withheld from them prior to Michael’s adoption. Under that law, "the medical histories of a child legally freed for adoption * * * and of his or her natural parents, with information identifying such natural parents eliminated, shall be provided by an authorized agency to such child’s prospective adoptive parent and upon request to the adoptive parent * * * when such child has been adopted * * * Such medical histories shall include all available information setting forth conditions or diseases believed to be hereditary, any drugs or medication taken during pregnancy by the child’s natural mother and any other information, including any psychological information * * * which may be a factor influencing the child’s present or future health” (Social Services Law § 373-a). The fact that Michael’s adoption was finalized many years before the enactment of Social Services Law § 373-a does not relieve defendant of its statutory obligation to disclose the information (Matter of Malowsky v D’Elia, 160 AD2d 798 [2d Dept 1990]). Thus, to the extent the information sought falls within the ambit of section 373-a, defendant must provide it.
The balance of the information sought by plaintiffs falls under two categories: information about defendant’s procedures and employees, who are potential witnesses; and back *322 ground information about Michael’s natural parents and their family that goes beyond the scope of medical histories.
Answers to questions of the first type do not entail disclosure of any confidential information and must be supplied by defendant, including names and addresses of its employees and of its former employees, if known. If the information sought is contained in documents which reveal identifying facts about the natural parents, defendant may extract it and furnish it to plaintiffs in another form.
The questions under the second rubric fall within the ambit of Domestic Relations Law § 114. That statute, which defines the order of adoption and provides for the sealing of the records, was amended in 1989 to require disclosure to the adoptive parents of "the child’s medical history, heritage of the parents, which shall include nationality, ethnic background and race; education, which shall be the number of years of school completed by the parents at the time of the birth of the adoptive child; general physical appearance of the parents at the time of the birth of the adoptive child * * * including all available information setting forth conditions or diseases believed to be hereditary, any drugs or medication taken during the pregnancy by the child’s mother; and any other information which may be a factor influencing the child’s present or future health, talents, hobbies and special interests of parents.” Thus defendant, if it has not already done so, shall furnish all such information forthwith directly to plaintiffs.
As to the balance of the information sought, section 114 provides that "[n]o order for disclosure or access and inspection shall be granted except on good cause shown and on due notice to the adoptive parents and to such additional persons as the court may direct.” Good cause is more than mere curiosity. It may be established by a showing of psychological trauma or medical need (Matter of Wilson, 153 AD2d 748), or even by concern for the possibility that a genetic or hereditary factor might be passed on the adoptee’s issue (Matter of Chattman v Bennett, 57 AD2d 618).
The public policy of this State protecting confidentiality of adoption records has been clearly enunciated: "sealed records shield the adopted child from possibly disturbing facts concerning the child’s birth or parentage; sealing insures that the natural parents will not be able to locate the child and interfere with the relationship between the child and the *323 adoptive parents; and, finally, sealing protects the identity and privacy of the natural parents” (Matter of Walker, 64 NY2d 354, 361). Under the circumstances of this case, granting plaintiffs’ application will not contravene that policy, which does not consider immunizing an adoption agency from tortious conduct a reason to seal adoption records. However, to safeguard the natural parents it is imperative that the court strictly oversee the disclosure (see, Matter of Louis F., 42 NY2d 260).
CONCLUSION
It appears that Michael has not been in contact with his natural mother, and in order to preserve her anonymity while ensuring that her interests will be represented in this proceeding, a guardian ad litem must be appointed (Matter of Anonymous, 92 Misc 2d 224, supra; Matter of Hayden, 106 Misc 2d 849). Sylvia Malamud, Esq., of 30 Wedgewood Drive, Westbury, New York 11590 (phone No. [516] 333-4670), is hereby appointed guardian ad litem for the natural mother. Defendant shall advise the guardian forthwith of the identity and last known whereabouts of the natural mother and the guardian shall provide her with notice of this proceeding (see, Matter of Linda F.M., 52 NY2d 236; Golan v Wise Servs., 69 NY2d 343).
Accordingly, plaintiff’s motion is granted to the extent that, good cause for disclosure having been found, defendant is ordered to turn over to this court, within 20 days of service on both defendant and the guardian ad litem of a copy of this order with notice of entry, all the records in question and complete answers to plaintiff’s interrogatories for an in camera inspection. After the court has examined the records and the guardian has submitted a report, a hearing, if necessary, will be scheduled.

 For a comprehensive analysis of the genesis of this tort, see, Blair, Getting the Whole Truth and Nothing but the Truth: The Limits of Liability for Wrongful Adoption, 67 Notre Dame L Rev 851 (1992); Connelly, The Need for Disclosure Laws: A Survey of the Wrongful-Adoption Cause of Action and Statutory Remedies for Adoption Fraud, 10 Rev Litig 793 (1991); Dickson, The Emerging Rights of Adoptive Parents: Substance or Specter?, 38 UCLA L Rev 917 (1991); LeMay, The Emergence of Wrongful Adoption as a Cause of Action, 27 J Fam L 475 (1989).