■ ARTHUR ROSS et al., Respondents-Appellants, v LOUISE WISE SERVICES, INC., Appellant-Respondent. [812 NYS2d 325]—

Order, Supreme Court, New York County (Barbara R. Kapnick, J.), entered May 20, 2004, which denied defendant's motion for summary judgment dismissing the complaint; granted the branch of defendant's motion to dismiss the second and third causes of action as barred by the applicable statute of limitations; limited plaintiffs' potential recovery of compensatory damages to the extraordinary out-of-pocket expenses of raising their adopted child to age 21; and denied defendant's motion to dismiss plaintiffs' claims for punitive damages, affirmed, without costs.

Nardelli and Sweeny, JJ., concur in a memorandum by Nardelli, J., as follows: In this action, it is alleged that defendant adoption agency concealed and misrepresented the subject infant's bilateral family history of mental illness/schizophrenia at the time of adoption by plaintiffs, and continued to do so for decades thereafter, thereby hindering plaintiffs' doctors from making an accurate diagnosis, while plaintiffs' family unit gradually disintegrated. At issue in this appeal is whether the motion court properly dismissed plaintiffs' second and third causes of action, sounding in negligence, breach of fiduciary duty and intentional infliction of emotional harm, and allowed plaintiffs' claim for punitive damages to go forward.

This matter has at its core the adoption of nonparty Anthony Ross, by plaintiffs Arthur and Barbara Ross, through defendant adoption agency, Louise Wise Services, Inc. The complaint, filed in June 1999, seeks compensatory, emotional and punitive damages. The motion court declined to dismiss plaintiffs' first cause of action for wrongful adoption and fraud, and that branch of the decision is not at issue on this appeal.

## Background

Defendant's adoption file indicates that plaintiffs first contacted the agency in 1960, seeking to adopt an infant, of either sex, "with a background as matchable [sic] as you deem important for the child's well-being." An interview was thereafter conducted, during the course of which the interviewer noted that plaintiffs "would be interested in hearing" everything that was known about the parents.

On December 5, 1960, the baby at issue, as yet unborn, was referred for adoption. The referral summary described the child's biological mother as having had an unhappy childhood, which left many emotional scars, leaving her unable to care for a child. The referral also noted that the mother was unable to complete school because of various psychological factors, and that she affirmatively stated that her home situation was abnormal, and that perhaps she was not normal. The mother further opined that there was "so much sickness in her family," and that her mother died of leukemia when she was four, and her father was plagued with illness, both physical and mental, including a period of 1½ years during which he was hospitalized for schizophrenia, believing people were trying to poison him. The birth mother herself, according to a contemporaneous report filed by a Louise Wise employee, was under the care of a psychiatrist, who described her as a "girl who was failing in her major adjustments to life . . . failed to maintain matriculation

at two colleges; few friends; hostility to most people . . . feelings of hopelessness and isolation," with a "guarded" prognosis.

The baby's birth father, as set forth in the referral, had strong feelings regarding "pre-determination" and, prior to the completion of the adoption, was diagnosed as a paranoid schizophrenic, which diagnosis was documented in Louise Wise's file. The file also included the summary notation that the child's parents were "disturbed people."

On March 28, 1961, plaintiffs were informed that a baby was available, that he had been born in a hospital, and that his physical condition was good. The birth mother was described as a bright person, and a high school graduate who later attended a school of design because she had "a talent for this." The birth father was portrayed as a high school graduate who attended a university for a time and then a school of design, and was currently attending a fine arts school during the day and working at night to finance his courses. Plaintiffs, after seeing the baby and hearing of his background, indicated interest in adopting the child, and after defendant's representative made several visits to the Ross home between April 1961 and February 1962, an order of adoption was issued in May 1962. Plaintiffs maintain that defendant and its staff made absolutely no suggestion of any mental illness in either of the birth parents, or their families, and that had they known of the infant's true family history, they would have never agreed to the adoption.

The child, whom plaintiffs named Anthony, began exhibiting signs of abnormal emotional development and by age four, plaintiffs had consulted a social worker regarding Anthony's abnormally impulsive and hyperactive behavior. The counseling, however, had little effect and by 1970, Anthony had little impulse control, was loud and abusive to guests, would strike Ms. Ross, throw things, use inappropriate language, and walk in his sleep, acting as if someone was trying to hurt him. Plaintiffs, as a result, contacted defendant's executive director, Florence Kreech, who referred them to Barbara Miller, the head of defendant's postadoption services.

Plaintiffs maintain that they requested any information available on Anthony's background, to which Ms. Miller replied that plaintiffs were already in possession of all of Anthony's medical background information. Ms. Miller testified at a deposition conducted in May 2001 that although it was not yet certain that Anthony was suffering from schizophrenia, "his behavior was aberrant enough to raise questions that that's where he might be headed." Ms. Miller, however, did not share this insight with plaintiffs, or information of Anthony's family history of schizophrenia and mental illness, due to "agency policy."

Plaintiffs were then referred to Dr. Anne-Marie Weil, a psychiatrist employed by defendant who, although aware of Anthony's medical history, also neglected to advise plaintiffs of such, despite seeing Anthony on a number of occasions. Anthony's condition, despite these visits, continued to deteriorate.

Plaintiffs, in 1973, engaged a psychiatrist, Dr. Stella Chess, to assist Anthony and, in conjunction therewith, Ms. Ross wrote to Ms. Miller requesting that all the information the agency had about Anthony's background be sent to Dr. Chess. Ms. Ross, by this point in time, was in physical fear of Anthony, both for herself and the couple's other adopted child, Susan, and that as a result, the couple's marriage was deteriorating because of their inability to agree on how to cope with Anthony's behavior. Once again, despite being aware of the foregoing familial stress and deteriorating behavior of Anthony, defendant, remarkably, provided no information regarding Anthony's family history of mental illness and schizophrenia to Dr. Chess.

Ms. Ross, as Anthony's behavior continued to regress, concluded that it was unsafe for her and Susan to remain in the same house with him and, as a result, they moved out. Plaintiffs were subsequently divorced in 1979 after 26 years of marriage.

Ms. Miller received a call from Ms. Ross in August 1981, at which time she learned that plaintiffs had divorced and that Anthony had remained with his father. Ms. Ross also informed Ms. Miller that Anthony continues to be "disturbed," has very few friends, is withdrawn, relies on his father for menial jobs, and that Mr. Ross continues to be devoted to him. Armed with this information, Ms. Miller still withheld Anthony's true medical history.

In June 1982, Anthony appeared at Dr. Weil's office, without an appointment, asking about a report Dr. Weil had purportedly sent to someone. Ms. Miller noted in her records that "Dr. [Weil] was very concerned and frightened by Tony's appearance and demeanor. She felt he was *a paranoid schizophrenic, capable of violence and wanted me to be aware of this*, should Tony ever request an appointment here" (emphasis added). Amazingly, whereas Dr. Weil found it necessary to issue a strong caution to defendant's staff regarding Anthony, neither Dr. Weil, nor Ms. Miller, saw fit to warn plaintiffs that defendant's staff psychiatrist had concluded that Anthony was a paranoid schizophrenic capable of violence.

Anthony, over the course of years that he resided with his father, generated numerous stressful incidents including: being arrested for stealing medications from a doctor's office; harass-

ing neighbors; breaking a surveillance camera specifically placed in the apartment building where he and his father resided to keep watch over him; being the subject of eviction proceedings due to his aberrant behavior; and sabotaging his father's personal relationships.

In 1983, the New York State Legislature enacted section 373-a of the Social Services Law, which provided: "Notwithstanding any other provision of law to the contrary, to the extent they are available, the medical histories of a child legally freed for adoption and of his or her natural parents, with information identifying such natural parents eliminated, shall be provided by an authorized agency to such child's prospective adoptive parent; and . . . to such child when discharged to his or her own care. The medical histories shall include all available information setting forth conditions or diseases believed to be hereditary, any drugs or medication taken during pregnancy by the child's natural mother, and any other information which may be a factor influencing the child's present or future health" (L 1983, ch 326).

In 1985, the Legislature amended the above law to add the requirement that the disclosure be made not only to the child's prospective parent, but also to the "adoptive parent when such child has been adopted" (L 1985, ch 103), and a second amendment, also enacted in 1985, provided that the disclosed information must incorporate "any psychological information in the case of a child legally freed for adoption or when such child has been adopted" (L 1985, ch 142).

The New York State Legislature, also in 1983, added sections 4138-b,[1] 4138-c and 4138-d to the Public Health Law, which established an "adoption information registry" in the Department of Health, allowing an adult adoptee to register and obtain nonidentifying medical information concerning his/her birth parents. By letter dated December 28, 1983, defendant's then executive director informed the Department of Health that Louise Wise "has established its own mutual consent adoption registry." Defendant's director of training, Roslyn Ganger, testified that it then became the agency's practice to inform inquirers of their right to register.

In early 1984, Anthony called defendant to schedule an appointment in order to receive background and medical information and Ms. Miller expressly instructed her assistant, who was

---

1. Public Health Law section 4138-b was repealed, effective July 24, 1992.

designated to meet with Anthony,[2] that nothing was to be said about his family history of schizophrenia. Anthony was also not informed of his right to enroll in the adoption information registry. This information was not disclosed, according to Ms. Miller, "because the agency policy would not permit it." Ms. Miller, in June 1984, was also informed that Anthony's birth mother had committed suicide 11 years earlier, another piece of the puzzle that was never revealed to plaintiffs.

In 1994, Ms. Ross called defendant and voiced her belief that Anthony was suffering from attention deficit hyperactivity disorder. Defendant, despite the passage of, and amendments to, section 373-a of the Social Services Law almost 10 years earlier, did nothing to correct Ms. Ross's misimpression, even though, 12 years earlier, its own psychiatrist diagnosed Anthony as a paranoid schizophrenic capable of violence.

In 1995, Mr. Ross awoke in bed to find Anthony standing on top of him, wielding a large flashlight with the apparent intent to injure him. Not long thereafter, Anthony began throwing stones into the courtyard of their apartment building, at which point Mr. Ross called the Bellevue Hospital Mobile Crisis Unit. Anthony was subsequently diagnosed as suffering from paranoid schizophrenia, and while he was initially placed in a facility for the mentally ill, further erratic behavior toward the facility's employees resulted in his transfer to the psychiatric ward.

In 1999, due to the constant strain from the continuing difficulties with Anthony, Mr. Ross developed clinical depression so severe, he was hospitalized at Mount Sinai Hospital, where he underwent a series of electroshock treatments, resulting in some permanent memory loss. Ms. Ross also claims to suffer frequent bouts of depression stemming from her divorce and inability to help Anthony.

Defendant, in support of its motion for summary judgment, submitted an affidavit from Anita Longo Sorenson, a social worker, who opined that it was the general opinion and belief of social workers and other professionals in the adoption field in the 1960s and into the early 1980s that nurture played a much greater role than nature in the development of a child.[3] Moreover, it was the belief and general opinion of social workers and

---

2. Perhaps in view of Dr. Weil's warning.

3. In *Juman v Louise Wise Servs.* (174 Misc 2d 49, 53 [1997], *mod* 254 AD2d 72 [1998]), the defendant advocated a somewhat different scientific time line. The court therein noted that "[t]he Agency claims that at the time of the adoption [1966] members of the scientific community held differing opinions concerning whether schizophrenia was a disease that could be inherited. They present evidence that *it was not until 1968 that 'the literature suggested that*

other professionals in the adoption field at those times that mental illness would not be passed on if a child were placed in a loving environment.

It was also alleged by Ms. Sorenson that the general opinion and belief of social workers and other professionals in the adoption field at those times was that the disclosure of certain information to prospective adoptive parents would interfere with the bonding between adoptive parent and child and prove detrimental to the child, the parents and their relationship. Therefore, it was the practice of social workers and other professionals in the adoption field in the 1960s and into the early 1980s not to disclose information that could be viewed as negative and which was not believed to be hereditary for fear that it would influence the family adversely on how they would nurture the adopted child.

Ms. Kreech testified that defendant's staff was instructed to never inform parents about schizophrenia in the family of a child offered for adoption, as it was considered "upset[ting]." Ms. Kreech acknowledged that while thought was given to the fact that this was a lifetime responsibility for parents, in those days it was simply not disclosed.

Ms. Miller echoed Ms. Kreech's testimony regarding defendant's policy toward disclosing any information about schizophrenia, one concern being that any such disclosure would create anxiety in adoptive parents "so every time the child sneezes, they think something is wrong." Ms. Miller further testified that when the law changed in 1983, "we told the truth," but, upon further questioning, backtracked and claimed that defendant did not, in fact, obey the 1983 disclosure laws because the agency's attorney failed to advise defendant about the new laws until 1990. Ms. Miller's testimony, however, is problematic at best, as the agenda of a conference held at Louise Wise on November 29, 1983, which was headlined as "The Adoption Registry Law: Implications and Implementation," lists Ms. Miller as a *speaker* on the topic "The Impact of the Law on an Adoption Agency's Practices, Past and Present." Moreover, defendant's director of training, Roslyn Ganger, testified that she discussed the Adoption Registry Law with Ms. Miller "[p]robably when it was promulgated."

Plaintiffs, in sharp contrast, submitted an affidavit from Dr. Dolores Malaspina, an associate professor of psychiatry at Co-

---

*there was sufficient evidence to postulate that there was a genetic component to the etiology of schizophrenia' " (id.* [emphasis added]). In this matter, defendant insists, through various parties, that the belief was schizophrenia was a product of "nurture not nature" until the 1980s.

lumbia University and research psychiatrist at the New York State Psychiatric Institute, whose work concentrates on schizophrenia. Dr. Malaspina opined, inter alia, that: research, as early as 1911, had established that 90% of schizophrenia cases were inherited; its familial basis has never been seriously contested; early disclosure to Anthony's family would have led to earlier treatment, minimizing his deterioration and decreasing the enormous stress on his parents, as early diagnosis significantly improves the outcome for those with the disease; and it was difficult to postulate any justification for defendant's failure to warn plaintiffs that they had assessed Anthony as dangerous. Dr. Malaspina also surmised that the false information given plaintiffs' family psychiatrist made it 50 times less likely that he would be correctly diagnosed, as many other psychiatric disorders present with similar manifestations.

Dr. Malaspina noted that the type of chronic psychosocial stress experienced by caregivers of a child with schizophrenia is an absolutely accepted pathway to the development of severe major depression. Dr. Malaspina went into the symptoms that would be experienced, in detail, and noted a caregiver's tendencies toward self-blame, which would have been ameliorated if plaintiffs had been advised of Anthony's predisposing genetic factors toward schizophrenia.

Plaintiffs, in early 1999, once again contacted defendant to request information regarding Anthony's medical history, having been prompted to do so by a New York Times article concerning a case with facts similar to those currently presented at bar. On April 6, 1999, defendant provided the psychiatric information it had withheld for almost 40 years and on June 25, 1999, plaintiffs commenced the within action.

## Supreme Court Proceedings

Defendant, after the close of discovery, moved for summary judgment dismissing the complaint or, in the alternative, for partial summary judgment: dismissing the second and third causes of action as time-barred; dismissing plaintiffs' claim for emotional distress, and limiting their damages to extraordinary out-of-pocket expenses in raising their adopted child to 21 years of age; and striking plaintiffs' demand for punitive damages.

The motion court: denied that branch of defendant's motion which sought to dismiss the complaint in its entirety; denied defendant's request to dismiss plaintiffs' claim for punitive damages; dismissed plaintiffs' claims for negligence, breach of fiduciary duty and intentional infliction of emotional harm, as time-barred; and limited plaintiffs' potential recovery of

compensatory damages to the extraordinary out-of-pocket expenses of raising Anthony to age 21.

Defendant appeals, plaintiffs cross-appeal, and we now affirm.

## Discussion

### Punitive Damages

Initially, we note that claims for "wrongful adoption" have only recently been recognized as viable tort actions in New York, this Court having previously reasoned that New York's vital interest in the welfare of its children, as well as in the adoption process, which advances that vital interest, warranted an extension of well-settled common-law fraud principles to the adoption process (*Juman v Louise Wise Servs.*, 211 AD2d 446, 447 [1995]). Indeed, a growing number of jurisdictions have begun recognizing "wrongful adoption" actions, although such recognition is not uniform (*see* Milks, Annotation, *"Wrongful Adoption" Causes of Action Against Adoption Agencies Where Children Have or Develop Mental or Physical Problems That Are Misrepresented or Not Disclosed to Adoptive Parents*, 74 ALR5th 1).

It has long been understood that an award of punitive damages serves a dual purpose, to punish the offending party, and to deter similar conduct on the part of others (*Krohn v New York City Police Dept.*, 2 NY3d 329, 335 [2004]; *Honzawa v Honzawa*, 309 AD2d 629, 629-631 [2003], *lv dismissed in part and denied in part* 2 NY3d 753 [2004], *cert denied* 541 US 1064 [2004]). In a fraud cause of action, punitive damages may only be recovered when the conduct in question is aimed at the public generally, involves a high degree of moral culpability, and rises to a level of "such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v Sheldon*, 10 NY2d 401, 405-406 [1961]; *Kelly v Defoe Corp.*, 223 AD2d 529 [1996]; *see also Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 613 [1994]). "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts" (*Nardelli v Stamberg*, 44 NY2d 500, 503 [1978]; *Swersky v Dreyer & Traub*, 219 AD2d 321, 328 [1996]).

In the matter before us, defendant deprived plaintiffs of the key to their son's illness when he was nine years old, lied to Anthony's private psychiatrist when he was 12, failed, outrageously, to warn plaintiffs that Dr. Weil had diagnosed Anthony as schizophrenic and capable of violence when he was 19, and again lied to Anthony, this time in violation of the law, when he

was 23. Defendant's nearly four decades of duplicity and deceit subsequent to the adoption prevented Anthony from obtaining a correct diagnosis and treatment, deprived plaintiffs of the ability to understand their situation, and, finally, brought about the disintegration of the family unit, the ruin of Mr. Ross's career,[4] and his eventual hospitalization and treatment for severe depression.

Moreover, defendant's justification for its actions is muddled, at best. Ms. Miller claims that she did not learn of the 1983 changes in the law requiring disclosure until 1990, yet evidence was presented that she lectured on the law, and its implications, and spoke to a colleague about it in 1983, shortly after the law was promulgated. Compounding the foregoing is defendant's assertion, in this action, that it was not thought heredity was a factor in schizophrenia until 1980, yet its admission in a prior action that such evidence, which postulated that there was a genetic component to the etiology of schizophrenia, existed in 1968.

In sum, we find factual issues as to whether defendant's actions and omissions, summarized above, especially its failure to warn plaintiffs of Anthony's capability of violence, *regardless of "agency policy"* requiring the withholding of information from adoptive parents, constitutes a policy aimed toward the general public, sufficient to warrant the submission of plaintiffs' claims for punitive damages to a jury.

Negligence/Breach of Fiduciary Duty

We agree with the motion court that plaintiffs' second cause of action, sounding in negligence and breach of fiduciary duty, was properly dismissed as time-barred, as a cause of action asserting breach of fiduciary duty, which seeks monetary relief, is governed by a three-year limitations period (CPLR 214; *Papp v Debbane*, 16 AD3d 128 [2005]; *Deutsch v Polly N. Passonneau, P.C.*, 297 AD2d 571, 572 [2002]). Here, the adoption of Anthony was finalized in 1962, and it was at this juncture that the applicable limitations period began to run. Since plaintiffs do not allege any additional misrepresentations by defendant until 1970, some eight years later, this cause of action became time-barred in 1965.

Intentional Infliction of Emotional Distress

Plaintiffs' third cause of action, asserting intentional inflic-

---

4. Arthur Ross, at the time of the adoption, stated that he was a nationally known figure in the advertising profession, had won more than 150 awards for creative film/radio and television productions, including "Best Commercial" in several different industry categories, and was awarded the Grand Prix de la Television at the Venice Film Festival in 1962.

tion of emotional distress, is subject to a one-year limitations period (CPLR 215 [3]; *Brasseur v Speranza*, 21 AD3d 297, 298 [2005]; *Spinale v Guest*, 270 AD2d 39, 40 [2000]), and is therefore time-barred. Moreover, as this Court recently held in *Juman v Louise Wise Servs.* (3 AD3d 309, 309-310 [2004]), damages in a wrongful adoption case are limited to pecuniary losses which flow directly from the alleged fraud, and damages which purportedly arise as the result of emotional distress do not fall within that description (*see also Juman v Louise Wise Servs.*, 254 AD2d 72, 73-74 [1998]; *Becker v Schwartz*, 46 NY2d 401, 413-415 [1978]).

Equitable Estoppel

Finally, we agree with the motion court that plaintiffs may not invoke the doctrine of equitable estoppel to preclude defendant from asserting the statute of limitations as a defense.

The doctrine of equitable estoppel, an "extraordinary remedy" (*East Midtown Plaza Hous. Co. v City of New York*, 218 AD2d 628, 628 [1995]), provides that a defendant may be estopped from pleading the statute of limitations where the plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action" (*Simcuski v Saeli*, 44 NY2d 442, 448-449 [1978]; *Kaufman v Cohen*, 307 AD2d 113, 122 [2003]), or, stated another way, that the plaintiff was "lulled" into inaction by defendants so that the statute of limitations would expire (*Incorporated Vil. of Rockville Ctr. v Town of Hempstead*, 278 AD2d 279, 280 [2000]). The fraud upon which the application of the doctrine is based must be separate and distinct from the acts underlying the action itself (*Rizk v Cohen*, 73 NY2d 98, 105-106 [1989]; *Kaufman v Cohen*, 307 AD2d at 122). The doctrine requires proof that the defendant made an actual misrepresentation or, if a fiduciary, concealed facts it was required to disclose and that plaintiff's reliance resulted in an untimely action (*Heffernan v Marine Midland Bank*, 283 AD2d 337 [2001]; *Powers Mercantile Corp. v Feinberg*, 109 AD2d 117, 122 [1985], *affd* 67 NY2d 981 [1986]), and " 'mere silence or failure to disclose the wrongdoing is insufficient' " (*Doe v Holy See [State of Vatican City]*, 17 AD3d 793, 795 [2005], quoting *Zoe G. v Frederick F.G.*, 208 AD2d 675, 675-676 [1994]). Due diligence on the part of plaintiff in commencing the action is an essential element when plaintiff seeks the shelter of this doctrine (*Simcuski v Saeli*, 44 NY2d at 450; *Fuchs v New York Blood Ctr.*, 275 AD2d 240, 241 [2000], *lv denied* 95 NY2d 769 [2000]).

In this matter, plaintiffs contend that the underlying breach of fiduciary duty occurred at the time of the adoption, but allege

no additional separate and distinct acts upon which the application of the doctrine can be based. Indeed, the next alleged misrepresentations to plaintiffs were made in 1970, eight years after the cause of action accrued and five years after it was rendered time-barred. These alleged misrepresentations do not serve to resurrect the breach of fiduciary duty claim.

Tom, J.P., and Saxe, J., concur in a separate memorandum by Tom, J.P., as follows: In this action for wrongful adoption, plaintiffs allege that they were induced to adopt their infant son, Anthony, as a result of defendant's fraudulent concealment of his family history of psychiatric illness. Defendant does not deny its failure to disclose the psychiatric history of the biological family, but admits that at the time of the 1962 adoption, it routinely withheld all such information from prospective adoptive parents. What divides this Court is whether defendant's conceded pattern of nondisclosure will support a claim for punitive damages predicated upon acts constituting "such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v Sheldon*, 10 NY2d 401, 405 [1961]), in this instance, the obligations to provide information pertinent to the decision to adopt and to deal honestly and fairly with the adoptive family (*see Juman v Louise Wise Servs.*, 211 AD2d 446, 447-448 [1995]).

This controversy raises the issue of the degree of proof that a plaintiff is required to supply in opposition to a motion seeking summary dismissal in order to avoid the striking of a claim for punitive damages. The dissenter, ignoring evidence that, even in 1962, the medical profession recognized a significant hereditary component to psychiatric illness, accepts without question defendant's protestation that the social work profession remained ignorant of knowledge possessed by the larger medical community and, accepting such ignorance as the standard by which to judge defendant's conduct, concludes that, as a matter of law, the record does not support plaintiffs' claim for exemplary damages. In the context of a motion seeking dismissal of the complaint, where factual issues warrant trial of the underlying cause of action for which punitive damages are claimed, we discern no reason to summarily resolve contested factual issues merely because they concern the nature of the damages sought as well as the merits of the underlying action.

This matter is before us on defendant's appeal from an order denying, in part, its motion for summary judgment dismissing the complaint (CPLR 3211 [a] [7]; 3212) to the extent of sustaining plaintiffs' claim for punitive damages and on plaintiffs' cross-appeal from the dismissal, as time-barred, of their second

cause of action asserting negligence and breach of fiduciary duty and their third cause of action asserting intentional infliction of emotional distress. Affording the pleadings a liberal construction, accepting their allegations as true and providing plaintiffs with "every possible favorable inference" (*Leon v Martinez*, 84 NY2d 83, 87 [1994]), plaintiffs have demonstrated the existence of facts which, if proven at trial, establish a pattern of conduct, aimed at the public generally, that evinces a wanton indifference to the right of prospective adoptive parents to make an informed decision to proceed with adoption.

The pertinent facts can be succinctly stated. Plaintiffs adopted their son, Anthony Ross, through defendant adoption agency in 1962. While they were informed of many positive characteristics of the biological parents, they were not informed, either at that time or for many years thereafter, that both suffered from mental illness and that their families had a history of schizophrenia. The mother was under the care of a psychiatrist during her pregnancy and was described as "a seriously disturbed young woman who related minimally." The father was diagnosed as paranoid schizophrenic and portrayed as "a seriously disturbed young man," who had married Anthony's mother "purely for her money." Anthony's maternal grandfather also suffered from schizophrenia and was hospitalized for a year and a half while under the delusion that people were trying to poison him. Anthony's biological parents divorced about a year after giving him up for adoption, and his mother committed suicide about 10 years later.

Anthony began to show signs of emotional disturbance as a young child and, by the time he was four, plaintiffs had sought professional help. In 1970, when the nine-year-old boy was exhibiting hyperactivity, poor impulse control and hostility, plaintiffs contacted defendant for assistance. While it is clear that defendant's employees recognized the distinct possibility that schizophrenia might be to blame for Anthony's difficulties, they did not share this insight with plaintiffs. During the following year, the family periodically saw defendant's staff psychiatrist, Dr. Anne-Marie Weil.

In 1973, Barbara Ross requested that defendant send "a summary of Tony's birth history, background and foster home experience" to his psychiatrist. The resulting summary made no mention of the extensive family history of mental illness. Anthony continued to exhibit little impulse control, striking Ms. Ross, throwing things and using foul language. In 1978, responding to the threat that Anthony's aberrant and aggressive behavior posed to her physical safety, Ms. Ross moved out

of the family home, taking the couple's adopted daughter with her. Disagreement about how to deal with Anthony's erratic and hostile behavior, and the emotional and financial toll on the couple resulted in the deterioration of the marriage, culminating in a 1979 divorce.

In 1982, the now-adult Anthony arrived unannounced at Dr. Weil's office. The doctor reported that "she was very concerned and frightened by Tony's appearance and demeanor. She felt he was a paranoid schizophrenic, capable of violence." In 1983, the Legislature enacted Social Services Law § 373-a (L 1983, ch 326, § 1), requiring the disclosure of an adopted child's medical history (see *Juman v Louise Wise Servs.*, 211 AD2d at 447-448). The next year, Anthony requested an appointment to obtain "background and medical information." At the ensuing meeting in February 1984, he was told nothing about his birth family's psychiatric history.

Anthony was diagnosed as a paranoid schizophrenic in 1995 after an incident in which his father awoke in bed to find Anthony on top of him, wielding a large flashlight in an apparent attempt to injure him. In 1999, Mr. Ross developed clinical depression as a result of the ongoing difficulties with his son. Mr. Ross was ultimately hospitalized and administered electroconvulsive therapy that resulted in some permanent memory loss. He was obliged to give up his career in advertising, and he has been unable to find other work. Barbara Ross also suffered from frequent bouts of depression following the couple's divorce and has been required to seek professional counseling.

It was not until April 6, 1999 that defendant, responding to a request from Arthur Ross, disclosed the detailed medical information contained in its files, which included notes summarizing 13 interviews with the mother and 14 with the father as well as the results of psychiatric consultations with both parents and the psychiatric history for both sides of Anthony's biological family. This lawsuit promptly followed stating causes of action for (1) fraud and wrongful adoption, (2) negligence and breach of fiduciary duty and (3) intentional infliction of emotional distress.

Defendant moved for summary judgment dismissing the complaint or, alternatively, for partial summary judgment (1) dismissing the second and third causes of action as time-barred; (2) dismissing plaintiffs' claim for emotional distress and consequential loss of business and other income and limiting damages to extraordinary out-of-pocket expenses incurred in raising their adopted child to age 21; and (3) striking plaintiffs' demand for punitive damages, as a matter of law, on the ground

that the facts do not warrant their award. Supreme Court granted defendant's motion for summary judgment to the extent of dismissing the second and third causes of action as time-barred and limiting plaintiffs' compensatory damages. The court denied that part of defendant's motion as sought to dismiss the claim for punitive damages.

On appeal, defendant argues that its concealment of Anthony's biological family history was reasonable, and that its "personnel provided the information they believed to be relevant, in accordance with accepted practice at that time." Plaintiffs contend that Supreme Court erred in failing to apply the doctrine of equitable estoppel to bar assertion of the statute of limitations in defense to their negligence and emotional distress causes of action.

Defendant has conceded engaging in a course of conduct, extending over a period of years, during which it concealed information material to the decision to adopt. We conclude that questions of fact exist concerning the extent to which family history was regarded as an etiological factor in the development of mental illness, particularly schizophrenia, at the time of the subject adoption. As to the cross appeal, there is no basis to apply equitable estoppel to preclude assertion of the time bar. In any event, plaintiffs' second cause of action for negligence is redundant, and the recovery for emotional injury sought in the third cause of action is precluded as a matter of policy. Therefore, we affirm the order in all respects.

The wrong alleged in the complaint is that defendant's concealment of Anthony's family history of schizophrenia fraudulently induced plaintiffs to adopt the child and further caused them to refrain from seeking early aggressive intervention to treat the pathology underlying his emotional instability. Although defendant has not appealed from this aspect of the motion court's order, we note that an action for fraud is timely if brought within two years of the discovery of the misrepresentation and that the complaint states a viable basis for recovery on that ground. Therefore, defendant's motion for summary judgment dismissing the complaint was properly denied (*see Moreau v Archdiocese of N.Y.*, 261 AD2d 456, 457 [1999]).

Plaintiffs' second cause of action asserts that defendant negligently failed to "disclose all facts bearing on their decision to adopt" Anthony. This merely restates their first cause of action, which alleges that "plaintiffs would not have adopted Anthony . . . had they known the true facts prior to the adoption or soon thereafter." The contention that defendant occupied a position "of special trust and confidence," advanced

only in the second cause of action, adds nothing to plaintiffs' claim. Whether or not the relationship between the parties is portrayed as fiduciary and whether the essence of the wrong alleged is deemed to be a breach of the adoption agreement or a breach of defendant's duty of care, it remains that this is an action for wrongful adoption, and recovery is circumscribed accordingly (*see Becker v Schwartz*, 46 NY2d 401, 413 [1978]).

No recovery is available on the basis of plaintiffs' third cause of action for intentional infliction of emotional distress. It is settled that in a wrongful adoption case, compensatory damages are "limited to damages for pecuniary loss directly attributable to the alleged fraud . . . Damages for emotional distress or for its somatic sequelae . . . do not fall within this description" (*Juman v Louise Wise Servs.*, 3 AD3d 309, 309-310 [2004]).

In any event, plaintiffs' second cause of action sounding in negligence and breach of fiduciary duty is untimely (CPLR 214; *Siler v Lutheran Social Servs. of Metro. N.Y.*, 10 AD3d 646, 648 [2004]), as is the third cause of action asserting an intentional tort (CPLR 215; *Peters v Citibank*, 253 AD2d 803 [1998]). The applicable limitations periods began to run at the time of Anthony's adoption in 1962 and had long expired at the time this action was commenced in 1999.

Plaintiffs' argument that defendant should be estopped to assert the statute of limitations as a bar to their second and third causes of action is unavailing. Application of this "extraordinary remedy" (*East Midtown Plaza Hous. Co. v City of New York*, 218 AD2d 628, 628 [1995]) requires affirmative action such as fraud, misrepresentations or deception by a defendant to conceal its wrongdoing until the applicable statutory limitations period has expired (*Simcuski v Saeli*, 44 NY2d 442, 448-449 [1978]). Plaintiffs' assertion of equitable estoppel is predicated on defendant's continuing failure to disclose the psychiatric history of Anthony's biological family. However, the statute of limitations for negligence had already expired by the time plaintiffs made contact with defendant in 1970, some nine years after the adoption. Defendant simply had no opportunity to undertake affirmative action to further conceal its wrongdoing within the pertinent statutory limitations period. Moreover, the concealment of Anthony's family history is the very wrong defendant is alleged to have committed and does not serve as a predicate for estoppel. At most, defendant engaged in mere nondisclosure during this time, for which estoppel to assert the statute of limitations is not warranted (*see Simcuski*, 44 NY2d at 452; *Kaufman v Cohen*, 307 AD2d 113, 122 [2003] [fraud]). As this Court noted in *Zoe G. v Frederick F.G.* (208 AD2d 675, 675-676 [1994]),

"application of the doctrine of equitable estoppel is triggered by some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient."

The defense to this action is remarkable for its concessions. Defendant does not deny that it deliberately concealed the psychiatric history of Anthony's biological family, both prior to the 1962 adoption and for nearly the remainder of the century. In seeking to strike the claim for punitive damages, defendant acknowledges that, even in 1962, there was a belief that schizophrenia had a genetic component; however it argues that it was "accepted practice" to conceal family psychiatric history because that view had not gained "general acceptance" among social workers. In support of this contention, defendant offered the affidavit of a social worker attesting that it was the practice, into the early 1980s, "not to disclose information that could be viewed as negative and which was not believed to be hereditary for fear that it would influence the family adversely on how they would nurture the adopted child." The affidavit concludes that "defendant acted in conformity with such customs, standards and practice in not disclosing the psychiatric history of Anthony Ross' biological parents." In opposition, plaintiffs presented the affidavit of a research psychiatrist, who stated that, as of 1961, "it had been undisputed for over 50 years at that time that schizophrenia was an inherited disease." The psychiatrist further noted that the likelihood of developing schizophrenia for a child who inherits genes from two affected parents is "estimated from many studies to be an astounding 46%."

Two questions immediately arise. First, even accepting defendant's claim of uncertainty among psychiatric professionals concerning the relevance of family history to the onset of psychiatric illness, why should its social worker be deemed competent to decide that family history is irrelevant to the possible onset of schizophrenia in a child? Indeed, the knowledge possessed by "adoption professionals" or by the social work profession in general is, on its face, an inferior standard by which to assess whether defendant's concealment of information was tortious as opposed to a standard consisting of the knowledge possessed by the apparently better-informed psychiatric profession. Second, if defendant truly regarded family history as being immaterial to the development of mental illness, including schizophrenia, why didn't defendant merely disclose such information to prospective adoptive parents and let them reach their own conclusions regarding its relevance to their decision to adopt? The act of concealment suggests a perception in

the mind of the actor that concealment is necessary. Defendant's persistence in concealing the psychiatric history of Anthony's family for some four decades only reinforces the notion that defendant regarded such concealment as essential to the protection of its own parochial interests.

The elements of a cause of action for fraud are a misrepresentation, that is material, known to be false and made with the intent of inducing reliance, upon which the victim actually relies and, as a result of which, sustains damages (*see National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.*, 257 AD2d 1, 9 [1999]). The only element of fraud contested by defendant is whether its misrepresentation was known to be material at the time it was made. Defendant denies any inkling, as of 1962, that concealing an adoptee's family psychiatric history could result in injury to the child or his adoptive parents. Defendant asks this Court to accept, on the basis of a preliminary record, what it knew, or did not know, in 1962 based on a single affidavit from a social worker that is flatly contradicted by the affidavit of a research psychiatrist. The extent of defendant's awareness of the state of psychiatric knowledge at that time presents a question of fact. It is the province of the trier of fact to resolve whether defendant's concealment was innocent, negligent or reckless in deciding whether defendant is liable and, if so, whether its misconduct is sufficiently egregious to warrant the award of punitive damages.

Defendant's suggestion that it concealed the family psychiatric history of adoptees solely out of a desire to promote familial bonding is unconvincing. Societal appreciation that family history plays a role in the emergence of psychiatric infirmity is as ancient as the taboo against incest. It doubtless occurred to defendant that disclosure of an extensive family history of mental illness would be likely to deter prospective parents from proceeding with an adoption, thereby depriving defendant of its placement fee. Thus, a jury might conclude that defendant placed its pecuniary interests ahead of its obligation to provide prospective adoptive parents with information necessary to make an informed decision as to whether to proceed.

Defendant expresses the concern that if plaintiffs are permitted to pursue their claim for punitive damages, "it is conceivable that jurors, unconvinced by plaintiffs' claims for compensatory damages but acting out of a misplaced feeling of sympathy, could award such damages even if undeserved." This concern is unwarranted. "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the

original trier of the facts" (*Nardelli v Stamberg*, 44 NY2d 500, 503 [1978]). However, as the Court of Appeals has observed, "since an award of punitive damages—in a case where they may properly be allowed—rests in the 'sound discretion' of the jury (*Kujek v Goldman*, 150 N.Y. [176], at p. 180), it is subject to court review" (*Walker*, 10 NY2d at 405 n 3 [upholding denial of motion to strike demand for punitive damages as "irrelevant and prejudicial" (*id.* at 403) pursuant to Rules of Civil Practice, rule 103 (now CPLR 3024 [b])]). In the case at bar, if the trial court decides that the matter of punitive damages is appropriate for submission to a jury and if the trier of fact decides that such damages are warranted by the evidence, the propriety of the award will be ripe for appellate review (*see Reinah Dev. Corp. v Kaaterskill Hotel Corp.*, 59 NY2d 482 [1983]; *Tanbro Fabrics Corp. v Deering Milliken, Inc.*, 39 NY2d 632 [1976]).

The cases relied upon by defendant do not preclude the recovery of exemplary damages in this matter. In *Juman v Louise Wise Servs.* (3 AD3d 309, 310 [2004], *supra*), this Court held that defendant's disregard of its disclosure obligations under Social Services Law § 373-a, enacted in 1983, was "irrelevant to plaintiffs' wrongful adoption claim" concerning a 1966 adoption and, thus, could not serve as a basis for the award of punitive damages. Likewise, in this action, the relevant factual inquiry concerns defendant's conduct surrounding the 1962 adoption, not its subsequent action or inaction over the ensuing decades. The material allegation of the complaint is that defendant deliberately concealed pertinent facts in order to induce plaintiffs to adopt Anthony. Plaintiffs assert that they were prompted to investigate the circumstances of the adoption only after learning of a similar case from a 1999 New York Times article, in which defendant was reported to have engaged in the same deceptive conduct. Indeed, defendant does not deny that it routinely withheld such information from prospective adoptive parents, conceding that this was its standard practice at the time. Plaintiffs further allege that defendant's fraudulent concealment hindered the prompt diagnosis and treatment of Anthony's psychiatric condition, resulting in pecuniary loss and the exacerbation of Anthony's suffering. The consequences to the adoptive parents were severe, resulting in their treatment for depression, hospitalization for Mr. Ross and the abandonment of his career and, ultimately, the breakup of the family. Accepting the truth of these allegations, as we must on a summary judgment motion (*see Ingle v Glamore Motor Sales*, 73 NY2d 183, 194 [1989]; *Rovello v Orofino Realty Co.*, 40 NY2d 633, 634 [1976]), they suggest that defendant, an agency offering adoption services to the general public, engaged in a pattern

of deception by concealing the psychiatric family history of children available for placement, in wanton and reckless disregard of the substantial risk of harm that its conduct presented to plaintiffs and other adoptive parents.

The basis for sustaining the punitive damages claim in this matter is fraudulent conduct aimed at the public in general that reflects a criminal indifference to the obligation of an adoption agency to provide prospective parents with information necessary to make an informed decision as to whether or not to adopt a particular child (*see Juman v Louise Wise Servs.*, 211 AD2d at 447; *Walker*, 10 NY2d at 405). Punitive damages are not available to compensate plaintiffs for emotional suffering, recovery for which is precluded by public policy in wrongful adoption cases (*see Becker v Schwartz*, 46 NY2d at 413; *Juman v Louise Wise Servs.*, 254 AD2d 72, 74 [1998]). Thus, defendant's compliance with Social Services Law § 373-a some two decades after the adoption and any consequent emotional impact on the family are simply not pertinent, either to the determination of liability or the assessment of punitive damages. That defendant was not in violation of any statutory duty at the time of the adoption, as the dissenter repeatedly emphasizes, is simply not material to the merit of plaintiffs' claims. The cause of action for fraud and the attendant demand for punitive damages are not predicated upon any statutory violation but upon the breach of defendant's *common-law* obligation to provide prospective adoptive parents with information that is vital to their ability to make an informed decision concerning the contemplated adoption.

*Jeffrey BB. v Cardinal McCloskey School & Home for Children* (257 AD2d 21, 25 [1999]), also relied upon by defendant, is likewise not dispositive. In contrast to a practice of concealing psychiatric information, conceded by defendant herein, the facts recited in *Jeffrey BB.* do not suggest any such pattern of deception. Rather the failure to disclose the adoptee's sexual abuse appears to have been an isolated omission. Finally, in *Juman v Louise Wise Servs.* (254 AD2d 72 [1998], *supra*), cited by the dissenter, the issue of punitive damages was not before us and was not addressed.

We have no quarrel with the dissenter's view that this case poses numerous unanswered factual questions, particularly those involving the state of psychiatric knowledge in 1962 with respect to the hereditary nature of schizophrenia and the weight that a family history of the disease would have been accorded in reaching a diagnosis of schizophrenia in a child. However, rather than attempt to answer such complex questions on the basis of

a sparse record on summary judgment, it is appropriate to leave resolution to the trier of fact on the basis of expert testimony at trial.

We reject the dissenter's conclusion that defendant's conduct is explained by "then-widely-held beliefs about the etiology of mental illness, and was motivated by a desire to find a good home for the child in question, not by any malicious desire to harm plaintiffs, nor with any certainty that they would be harmed by the placement." The record contains conflicting affidavits from expert witnesses concerning the state of psychiatric knowledge in 1962. Defendant's motivation may be attributed to the pursuit of monetary gain as readily as concern for the welfare of the child. And there is no indication in the record that the interests of the adoptive parents received even minimal consideration in effecting the placement. In purporting to resolve these several issues in favor of defendant, the dissenter engages in speculation as to defendant's motive and the improper determination of factual questions as a matter of law upon a motion seeking dismissal of the complaint. The function of a court on a summary judgment motion is issue finding, not issue determination (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]; *Wiener v Ga-Ro Die Cutting*, 104 AD2d 331, 333 [1984], *affd* 65 NY2d 732 [1985] *for reasons stated below*). As this Court stated in *Swersky v Dreyer & Traub* (219 AD2d 321, 328 [1996]), the award of punitive damages and the amount thereof are questions within the sound province of the trier of fact, which must decide whether "the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton."

Contrary to the dissenter's assertion, it is not necessary to establish that defendant's actions were prompted by an intention "to maliciously hurt others" in order to sustain plaintiffs' claim for punitive damages. Malice can arise from the wanton disregard of obligations, whether owed to the public (*see Sharapata v Town of Islip*, 56 NY2d 332, 335 [1982] [malicious, wanton or reckless conduct indicating improper motive or vindictiveness]) or to an individual (*see Giblin v Murphy*, 73 NY2d 769, 772 [1988] [" 'wanton or reckless disregard of plaintiff's rights' " (quoting 97 AD2d 668, 671 [1983])]; *cf. Borkowski v Borkowski*, 39 NY2d 982 [1976]). On the record before us, a trier of fact could conclude that defendant's conduct in concealing material information without regard to potentially disastrous consequences for the adoptive family, concededly engaged in as a mat-

ter of practice over a period of years, amounts to "such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker*, 10 NY2d at 405).

Upon the record adduced thus far, we conclude that plaintiffs will be able to produce evidence at trial which, if believed by the jury, would support the conclusion that defendant's conduct was in sufficient disregard of the rights of adoptive parents to justify the award of punitive damages (*see Walker*, 10 NY2d at 406 [noting the difficulty of stating "an all-inclusive rule" concerning what constitutes an appropriate case warranting recovery of exemplary damages]).

Friedman, J., dissents in part in a memorandum as follows: Plaintiffs are suing defendant Louise Wise Services, Inc. (LWS), an adoption agency, for its failure to disclose to them certain information about mental illness and instability in the biological family background of the child plaintiffs adopted in 1962. In the 4¹/₂ decades since 1962—spanning nine presidential administrations—the world has seen many dramatic changes, from the first moon landing, to the fall of the Berlin Wall, to the transformation of our understanding of the connection between a person's genetic endowment and his or her mental and emotional development. The main question on this appeal can be cast as whether the last mentioned transformation—the tremendous evolution in our collective view of the relationship between biology and psychology that has occurred since the early 1960s—should have any effect, as a matter of law, on the availability of an award of punitive damages against LWS. In my view, it should.

So far as the record shows, LWS's decision not to disclose the history of psychological disturbance in the biological family of plaintiffs' adoptive son, though potentially tortious under our holding in *Juman v Louise Wise Servs.* (211 AD2d 446 [1995], *affg* 159 Misc 2d 314, 316-320 [1994]), was the norm among adoption agencies in the early 1960s. Uncontradicted evidence in the record establishes that this practice was based on the belief, then still generally predominant among social workers, that "nurture" was more important than "nature" in determining a person's susceptibility to mental illness of the kind plaintiffs' son ultimately developed (he was diagnosed as a schizophrenic in 1995, at the age of 34). While, as the record shows, this belief had been challenged by some (but not all) scientists as of the early 1960s, what is relevant to determining LWS's level of culpability is the consensus that prevailed in the social work profession, and specifically among adoption agencies, at the time.

Contrary to an assertion made by one of my colleagues, I do not "ignor[e]" the evidence that, at the time of the adoption, many in "the medical profession recognized a significant hereditary component to psychiatric illness." Nor is there any basis for my colleague's claim that I "accept[ ] without question [LWS's] protestation that the social work profession remained ignorant" of such scientific developments. Rather, it is the majority that ignores the uncontroverted evidence that, whatever was happening on the frontiers of science in the early 1960s, social workers and adoption professionals of that time continued to believe that mental illness such as schizophrenia was largely caused by environmental factors, including dysfunction in the parent-child relationship. Plaintiffs have not presented an iota of proof to rebut LWS's expert evidence on this point. Further, scientific literature in the record demonstrates that a significant camp within psychiatry continued, for years after the subject adoption, to view family dynamics as a substantial factor in the causation of the illness. Thus, the view prevailing among adoption agencies of the time—that even a child of disturbed biological parents would avoid mental illness if reared in a stable and nurturing adoptive home—was not without support in the contemporary psychiatric community.

Underscoring the change in attitudes on this matter that has taken place since the early 1960s, it was not until the 1980s that the Legislature enacted the statute that now requires that the mental health histories of a child's natural parents be disclosed to prospective adoptive parents, and, in the case of a previously adopted child, to the adoptive parents "upon request" (Social Services Law § 373-a [L 1983, ch 326, as amended by L 1985, chs 103, 142, 270; L 1988, ch 584; L 1990, ch 165]). Social Services Law § 373-a became law more than 20 years after the completion of the subject adoption, and about 10 years after plaintiffs' last request to LWS for medical information bearing on their son's development (that is, their last request before the 1999 request that elicited the response precipitating this action). I do not question that plaintiffs may have a cognizable common-law claim based on conduct of a kind that was addressed by statute only years later. Still, the fact that there was no statutory mandate for the kind of disclosure at issue at the time of the underlying conduct, especially in a field as heavily regulated as adoption, should give us pause before allowing the undeniably subjective question of punitive damages to go to trial.

I do not believe that the judicial system should entertain a claim for punitive damages based on conduct that was norma-

tive in the relevant professional community when it occurred, but which will inevitably be assessed in accordance with the far-different beliefs and attitudes that prevail today, almost half a century later. While the discrepancy between the norms of the time of the conduct at issue and those of today is not a bar to plaintiffs' recovery of the limited measure of compensatory damages available in a "wrongful adoption" action (*see Juman v Louise Wise Servs.*, 254 AD2d 72, 74 [1998]), such a discrepancy is inconsistent with an award of punitive damages, a remedy not indiscriminately available for any tortious conduct, but only for conduct that was (as expressed by one member of this panel) motivated by an intention "to maliciously hurt" others, or "to wantonly inflict pain with the intent of injuring [them]" (*164 Mulberry St. Corp. v Columbia Univ.*, 4 AD3d 49, 60 [2004] [Tom, J.], *lv dismissed* 2 NY3d 793 [2004]). Surely, no one could rationally assert that LWS acted out of such motives. Moreover, we have frequently held that whether this elevated level of culpability can be proven may be determined as a matter of law on a properly supported motion for summary judgment.

The 1,900-page record for this appeal (from which the relevant facts are summarized below) clearly establishes that LWS's conduct, even if tortious, was based on then-widely-held beliefs about the etiology of mental illness, and was motivated by a desire to find a good home for the child in question, not by any malicious desire to harm plaintiffs, nor with any certainty that they would be harmed by the placement. Further, LWS has established—through competent and, on this record, uncontradicted expert evidence—that its actions at the time of the 1962 adoption were in accordance with the standards of practice then accepted in the social work profession. The present record is, in my view, more than sufficient to enable us to determine, as a matter of law, that LWS's conduct did not rise to the high level of culpability required for an award of punitive damages, just as the Third Department held in a prior wrongful adoption case that cannot be meaningfully distinguished from the instant case (*see Jeffrey BB. v Cardinal McCloskey School & Home for Children*, 257 AD2d 21 [1999]). Accordingly, while I concur in the affirmance of the dismissal of the second and third causes of action, I respectfully dissent to the extent the majority denies that portion of LWS's motion for summary judgment seeking to strike plaintiffs' demand for punitive damages.

## FACTS

### The Adoption at Issue

In 1960, plaintiffs Arthur and Barbara Ross, who were then

married, approached LWS seeking to adopt (according to Mr. Ross) "a healthy child from a healthy family," preferably one "from a family with an artistic background." LWS subsequently offered to place a male infant, born January 11, 1961, in plaintiffs' home, in contemplation of adoption. LWS informed plaintiffs that the infant's birth mother was "a bright person, who is a high school graduate, has gone to high school and a school of design, [and] has a talent for this." The maternal grandfather was said to have had a successful operation to remove a tumor from his kidney, but to have died subsequently as the result of "a bad heart." As to the birth father, plaintiffs were told that he was a student at a fine arts school, "an intelligent, ambitious young man, very dedicated to his art work." Plaintiffs agreed to accept the infant, and he was placed with them on March 30, 1961. The adoption of the infant, whom plaintiffs named Anthony, was finalized in 1962.

Anthony's Relevant Biological Family Background

At the time of Anthony's placement and adoption, plaintiffs were not told that either birth parent, or any member of either parent's family, had suffered from an emotional disorder or a mental illness. LWS's contemporaneous files show, however, that it was the agency's view that the birth parents (whose identities remain undisclosed) were "disturbed people who did well to surrender the baby."

Anthony's mother was referred to LWS by the psychiatrist she was seeing on a voluntary basis at the time she learned of her pregnancy.[1] The referring psychiatrist sent LWS a brief note stating that the mother was "failing in her major adjustments to life," as manifested by her "fail[ing] to maintain matriculation at two colleges," her "few friends," her "hostility to most people," and her "demanding dependency." In addition, the mother told LWS that her father (who died in 1960, at the age of 75) had been hospitalized for "schizophrenia" for a year and a half in the early 1950s, when he would have been at least 65.

As to the mental health of Anthony's father, the LWS files provide somewhat contradictory information. At various points in the files, the father (a design student who worked at an advertising agency) was described as "an intelligent, ambitious young man, very dedicated to his art work," and as "much better put together" than the mother. Still, the LWS social worker thought he was "a rather immature person," and referred him

---

**1.** The voluntary nature of the mother's treatment is indicated by the fact that, according to LWS's notes, she suspended the treatment for financial reasons during the pregnancy. She told LWS that she intended to resume treatment after giving birth.

to a psychiatrist for an evaluation. According to the notes of the LWS social worker, that psychiatrist told the agency—based on a single interview held on March 29, 1961—that the father was "a seriously disturbed young man," who could be "classified . . . as a paranoid schizophrenic." Paradoxically, however, the psychiatrist also told LWS that "while [the father] could use therapy, there was no rush about this."

The foregoing rather sketchy information is the reality behind what one of my colleagues characterizes, with a certain degree of exaggeration, as "the results of psychiatric consultations with both parents and the psychiatric history for both sides of Anthony's biological family" found among the "detailed medical information" in LWS's files. In fact, LWS's files do not contain any records of psychiatric treatment of either natural parent or any grandparent, nor do the agency's files contain any formal psychiatric reports concerning such individuals. Aside from the aforementioned informal referral note from the mother's psychiatrist, the information relating to mental health in LWS's files is entirely in the form of the LWS social worker's notes of oral conversations she had with the parents themselves and, to a much lesser extent, the psychiatrist who referred the mother and the psychiatrist who had one meeting with the father.

Anthony's Development and Illness

As Anthony grew up, he developed increasingly serious behavioral problems, including hyperactivity, sleepwalking, night terrors, unprovoked aggression, and antisocial behavior generally. The problem grew so bad that Mrs. Ross and the Rosses' daughter (whom they had adopted through LWS in 1964) began living separately from Mr. Ross and Anthony in 1978, and, in 1979, the Rosses divorced. As Anthony grew older, he became extremely withdrawn, and, as a young adult, although he graduated from college, he remained dependent on his father. Finally, after an apparently near-violent outburst against his father in 1995, Anthony was diagnosed as a paranoid schizophrenic; since that episode, he has resided in facilities for the mentally ill.

LWS's Postadoption Conduct

Plaintiffs also complain that, in 1970 and 1973, LWS gave misleading or incomplete responses to their requests for information about Anthony's background that might bear on his then-mounting behavioral problems. Notwithstanding that these exchanges occurred long before the enactment of Social Services Law § 373-a, I am troubled by LWS's lack of candor in responding to parents who were desperately seeking any information that might assist them in dealing with their child's

deteriorating mental health. However, as discussed more fully in the "DISCUSSION" section of this writing (and as Justice Tom appears to recognize), such postadoption conduct cannot provide a basis for an award of punitive damages. This is because postadoption conduct is, by definition, irrelevant to plaintiffs' only surviving cause of action, that for wrongful adoption or, stated otherwise, fraudulent inducement of the adoption.[2]

The Commencement of This Action and Subsequent Proceedings

In March 1999—about four years after Anthony was diagnosed as a schizophrenic in 1995—plaintiffs read a New York Times Magazine article about a wrongful adoption case concerning another child placed by LWS in the 1960s who subsequently developed mental illness. Prompted by this article, Mr. Ross sent LWS a letter, dated March 24, 1999, informing the agency of Anthony's diagnosis, and formally requesting all relevant medical information. In response, LWS sent Mr. Ross a letter, dated April 6, 1999, disclosing, among other things, that Anthony's maternal grandfather had been hospitalized for schizophrenia for a year and a half; that the birth mother had been "in therapy with a psychiatrist before giving birth and planned to return to treatment afterwards"; and that a psychiatrist had described the birth father to LWS as "a seriously disturbed young man" and "a paranoid schizophrenic."

Following their receipt of LWS's April 1999 letter, plaintiffs commenced this action in June of that year. The complaint alleges that, had LWS informed plaintiffs of the history of mental illness in Anthony's family at the time of the placement, plaintiffs would not have adopted him. Plaintiffs seek to recover compensatory damages for the extraordinary expenses they

---

**2.** The other instances of postadoption conduct by LWS of which plaintiffs complain did not, in my view, involve any violation of plaintiffs' rights. In 1981 and 1994, Mrs. Ross called LWS to seek advice or information about the Rosses' adopted daughter, and, while Anthony was incidentally mentioned in those conversations, there is no evidence that Mrs. Ross asked LWS for any further information about him. Anthony himself contacted LWS (directly or indirectly) in 1982 and 1984, but I do not believe that plaintiffs have standing to sue LWS for its conduct on these occasions, since Anthony was by then an adult, and approached the agency on his own, apparently without plaintiffs' knowledge. Nor am I aware of any legal basis for plaintiffs' contention that LWS was somehow obligated to inform them when it learned, in 1984, that Anthony's biological mother had committed suicide 11 years earlier.

incurred by reason of Anthony's mental disorders in raising him to the age of 21, as well as punitive damages.[3]

After the completion of substantial discovery in this action, LWS moved for, inter alia, partial summary judgment striking plaintiffs' demand for punitive damages. In the order appealed from, the motion court declined to dismiss the punitive damages issue from the case, based on its view that a jury question exists as to whether LWS's acts were sufficiently egregious to warrant such a remedy.

## Evidence Concerning the Relevant Practice Among Adoption Agencies in the Early 1960s

In support of the branch of its summary judgment motion seeking to strike the demand for punitive damages, LWS offered the affidavit of Anita Longo Sorenson, a certified and licensed social worker who has worked in the adoption field since 1957. Among other things, Ms. Sorenson's affidavit attests to the following (paragraph numbers omitted):

"It was the general opinion and belief of social workers and other professionals in the adoption field in the 1960s and into the early 1980s that nurture played a much greater role than nature in the development of a child. Moreover, it was the belief and general opinion of social workers and other professionals in the adoption field at those times that mental illness would not be passed on if the child were placed in a loving environment.

"It was also the general opinion and belief of social workers and other professionals in the adoption field at those times that the disclosure of certain information to prospective adoptive parents would interfere with the bonding between adoptive parent and child and prove detrimental to the child, the parents and their relationship. Therefore, it was the practice of social workers and other professionals in the adoption field in the 1960s and into the early 1980s not to disclose information that could be viewed as negative and which was not believed to be hereditary for fear that it would influence the family adversely on how they would nurture the adopted child. This practice remained in effect until changes were made in the Social Services Law and the Public Health Law in the early-mid 1980s."

Plaintiffs' opposition papers included an affidavit by a

---

3. The complaint also prays for damages for the emotional anguish (including Mr. Ross's clinical depression) and alleged loss of career opportunities plaintiffs have suffered as a result of Anthony's mental illness. The motion court held that, under applicable precedent, plaintiffs may not recover compensatory damages for such injuries (see *Juman v Louise Wise Servs.*, 254 AD2d at 74). Plaintiffs' cross appeal, as limited by their briefs, does not challenge this ruling.

research psychiatrist stating that, by the early 1960s, a body of research existed to support the view that there was a substantial hereditary component in the etiology of mental illness. Plaintiffs did not, however, submit any expert evidence rebutting the views of LWS's expert as to the prevailing beliefs and practice among adoption professionals in the early 1960s. Further, LWS, in reply, submitted a number of scientific publications, dating from 1967 to 1988, demonstrating that, for many years after Anthony's adoption, there continued to be significant support within the scientific community for the view that environmental factors, including the quality of the parent-child relationship, play a large role in the causation of schizophrenia.

## DISCUSSION

The Court of Appeals has made clear that punitive damages are available only where liability is based upon proof of misconduct that, beyond being merely tortious, bespeaks " 'such wanton dishonesty as to imply a criminal indifference to civil obligations' " (*Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 614 [1994], quoting *Walker v Sheldon*, 10 NY2d 401, 405 [1961]; *see also Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [1993] ["Punitive damages are awarded in tort actions where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime"] [citation, internal quotation marks and brackets omitted]; *Sharapata v Town of Islip*, 56 NY2d 332, 335 [1982] [punitive damages may be awarded only for "exceptional misconduct," such as acts performed "maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness"] [citations and internal quotation marks omitted]; *Wilson v City of New York*, 7 AD3d 266, 267 [2004] [claims for punitive damages were not cognizable where there was no indication that the alleged misconduct had "the character of spite, malice or evil motive"]). In applying this standard to determine whether a triable issue exists as to the availability of punitive damages, we have found that a demand for punitive damages should be dismissed where there is no evidence that the tortfeasor "was seeking to maliciously hurt" the injured parties or "to wantonly inflict pain with the intent of injuring [them]" (*164 Mulberry St. Corp. v Columbia Univ.*, 4 AD3d at 60).

In this case, LWS's failure to disclose the mental disorder in Anthony's family background at the time of the placement and adoption, although it may have been tortious, cannot reasonably be said to rise to the level of "such wanton dishonesty as to

imply a criminal indifference to civil obligations" (*Rocanova*, 83 NY2d at 614). Unlike today, in 1961 and 1962, when the placement and adoption occurred, there was no statute mandating the disclosure of such matters to prospective adoptive parents; indeed, as previously noted, that continued to be the case for two decades after the adoption. Not only was the matter of such disclosure not addressed by statute, the uncontradicted evidence before us is that it was the practice of adoption agencies in the early 1960s not to make such disclosure to prospective adoptive parents—a practice that was based on a view of the relationship between biology and mental health that, however obsolete it may be today, was then still prevalent in the social work profession, and then still found significant support (albeit not unanimous support) from research psychiatrists.[4] Further, LWS clearly was not "seeking to maliciously hurt" plaintiffs, or "to wantonly inflict pain with the intent of injuring [them]" (*164 Mulberry St. Corp. v Columbia Univ.*, 4 AD3d at 60). Rather, LWS's goal was to find a good home for Anthony, who was, at most, at increased risk for mental illness, but was not— even according to plaintiffs' expert—certain to develop it. Although Justice Tom asserts that a triable issue exists as to whether LWS—a not-for-profit corporation—acted out of a desire to advance its "pecuniary interests" by obtaining a placement fee, rather than out of a desire to find a home for the child, he adduces nothing from the record that would support a finding of a "pecuniary" motive for LWS's conduct. Indeed, not even plaintiffs have suggested that LWS's conduct was so crassly motivated.

Plaintiffs and the majority cannot legitimately elevate the level of LWS's culpability to one warranting punitive damages by pointing to the body of psychiatric research that, by the early 1960s, supported the view that there is a significant hereditary component in the etiology of schizophrenia. Other scientific literature in the record reflects that, for many years after Anthony was adopted, the view persisted among some research psychiatrists that family dynamics were a substantial factor in the causation of mental illness. Accordingly, the existence of the research adduced by plaintiffs is not the key to determining the culpability of LWS's conduct at the time Anthony was adopted.

More fundamentally, plaintiffs and the majority overlook the

---

4. Although the majority is correct to the extent it points out that the absence of a statutory violation is not a bar to plaintiffs' substantive cause of action under the common law, I believe that the fact that there was no statute addressing the matter in question at the relevant time does have considerable bearing on whether the degree of culpability for the conduct at issue warrants an award of punitive damages.

fact that the institution with which we are concerned—LWS—was staffed not by research psychiatrists, but by social workers. Based on the expert evidence presented by LWS—which plaintiffs have not refuted—the understanding in the social work profession in the early 1960s was that biological inheritance played a lesser role in a child's emotional development than did environmental influences, including, as previously noted, the quality of the parent-child relationship. Accordingly, the accepted custom and practice among adoption agencies at that time was to withhold information about the psychiatric history of a child's birth parents and their families. Significantly, it took an act of the Legislature—one that became law more than 20 years after the subject adoption—to make clear that the type of nondisclosure at issue here was no longer permissible. Even if plaintiffs ultimately prevail on their claim for compensatory damages, I believe, as stated at the outset of this writing, that it is inappropriate to allow the attitudes that have evolved as of the mid-2000s to be applied in determining whether actions LWS took in the early 1960s, in conformity with the relevant professional standards of the time, were so culpable as to warrant an award of punitive damages.[5]

To escape the implications of the uncontroverted expert evidence concerning the standards of adoption agencies in the early 1960s, Justice Tom essentially takes the position that the actions of a member of one profession (here, social work) may be judged by the standards of another profession with significantly different training, knowledge and function (medical psychiatry). Aside from the fact that it is uncontroverted on this record that, in the early 1960s, there was support from the psychiatric profession for the standard practice among adoption agencies of the time, I am not aware of any legal support or logical justification for my colleague's rather novel approach. To point to an obvious analogy, in a medical malpractice case, we do not hold a physician to a standard of practice higher than the one generally accepted by the medical profession in the relevant locale and field of specialization, even if some experts argue that the profession should adopt a different standard. In this case, the only competent evidence before us concerning the accepted standard of practice among adoption agencies in the early 1960s is the affidavit of LWS's social work expert. Contrary to my colleague's assertion, the social work expert's affidavit is not "flatly

---

**5.** It should also be noted that, at this stage of the litigation, plaintiffs have merely raised a triable issue as to "whether the misrepresented facts would have been viewed as material at the time of the placement and adoption" (*Juman v Louise Wise Servs.*, 254 AD2d at 73).

contradicted" by the affidavit of the research psychiatrist submitted by plaintiffs. Rather, the latter affidavit says nothing at all about the standards of the social work profession, instead giving a selective view of the range of the views among psychiatrists at the relevant time.

In considering whether LWS could be assigned a level of culpability warranting punitive damages, it is also noteworthy that plaintiffs' brief makes a considerable overstatement in asserting that LWS concealed a clearly established "double family history of schizophrenia" in Anthony's background. While the natural mother and father impressed the LWS social worker as maladjusted and emotionally disturbed young people (and the mother was certainly described as such by her psychiatrist), the record contains no indication that either parent had been a patient at a mental institution prior to the adoption, or that either had been subject to involuntary psychiatric treatment of any kind. Nor is there any indication, as more fully discussed in the immediately following paragraph, that either birth parent had been formally diagnosed with a major psychotic illness as of the time of the adoption. As to the maternal grandfather's year-and-a-half hospitalization for what the mother described as schizophrenia, that episode did not occur until late in the gentleman's life, when he was no less than 65 years old.

Although it is true (assuming the accuracy of LWS's notes) that a psychiatrist described the birth father as a "paranoid schizophrenic," the psychiatrist offered that apparently offhand, oral opinion based on only a single evaluation interview. That interview, which LWS arranged, was not part of a course of treatment, and there is no indication that the father ever received any systematic course of psychiatric treatment (although he is reported to have considered starting one). Indeed, as previously noted, the record indicates that the psychiatrist who interviewed the father told LWS that, "while he could use therapy, *there was no rush about this*" (emphasis added). It is certainly difficult to imagine a contemporary psychiatrist saying something like this about a person suffering from what we now call schizophrenia. The unreliability of LWS's information about the biological father is underscored by the uncontradicted observation of LWS's social work expert that, on this record, such "health/psychiatric history" as LWS possessed regarding the father was "not confirmed." According to the expert, the unreliability of such information was an independent ground, under the professional standards of the time, for LWS to withhold it from plaintiffs.

A further consideration argues against allowing plaintiffs'

claim for punitive damages to go forward. The purpose of punitive damages is to deter future repetitions of similar misconduct (*see e.g. Biondi v Beekman Hill House Apt. Corp.*, 94 NY2d 659, 663 [2000]). This action arises from the legal uncertainty that, until the 1980s, surrounded the issue of the extent of an adoption agency's obligation to disclose any psychiatric history in an adoptee's birth family. Today, that uncertainty has been settled by the Legislature through the enactment of Social Services Law § 373-a. The record includes an affidavit by the current president of LWS (which no longer organizes private adoptions) attesting that it is the agency's policy to comply fully with section 373-a and other statutes concerning disclosures relating to adoptions. Indeed, LWS's compliance with its statutory obligations is evidenced by the agency's disclosure of the information at issue in response to plaintiffs' request in 1999, which, the record shows, was the first time plaintiffs asked LWS for such information after section 373-a became law. There is no indication in the record that there is any existing concern that either LWS or other social service agencies are presently failing to fulfill their statutory adoption-related disclosure obligations. Since there does not appear to be any need to deter a repetition of the long-ago conduct for which LWS is being sued, an award of punitive damages in this case would serve little or no public purpose, but could threaten the ability of LWS, a not-for-profit institution, to carry out its mission, to the public's net detriment.

Instructive here is *Jeffrey BB. v Cardinal McCloskey School & Home for Children* (257 AD2d 21 [1999], *supra*), a wrongful adoption case in which the Third Department dismissed a demand for punitive damages on a motion for summary judgment, notwithstanding that the underlying cause of action was sustained insofar as it sought compensatory damages. In *Jeffrey BB.*, the defendant agency placed a child (Michelle) with the plaintiff adoptive parents, who had five other adoptive children. At the time of Michelle's adoption, the agency failed to disclose to the parents that the agency had reason to believe that Michelle had been a victim of sexual abuse, a history that allegedly created a danger that she would similarly abuse other children. The parents sued the agency upon learning of Michelle's history of abuse after she sexually molested two of her adoptive siblings (*id.* at 23). The Third Department, while otherwise reversing the lower court's grant of summary judgment dismissing the complaint against the agency, affirmed summary judgment dismissing the claim for punitive damages, with the following explanation: "In order to recover punitive damages, plaintiffs must demonstrate that the wrong complained of rose

to a level of such wanton dishonesty as to imply a criminal indifference to civil obligations (*Rocanova v Equitable Life Assur. Socy.*, 83 NY2d 603, 614, quoting *Walker v Sheldon*, 10 NY2d 401, 405). Based upon the evidence, there is no reasonable basis for a finding that Cardinal McCloskey's failure to disclose Michelle's past sexual abuse rose to such a level (*see, Rocanova v Equitable Life Assur. Socy.*, *supra*, at 614)." (*Jeffrey BB.*, 257 AD2d at 25 [internal quotation marks omitted].)

Justice Tom's attempt to distinguish *Jeffrey BB.* from the instant case is not persuasive. As the foregoing quotation shows, not a word in the *Jeffrey BB.* opinion lends support to my colleague's speculation that the punitive damages claim was dismissed because the failure to disclose the child's history was "an isolated omission" rather than part of a "pattern of deception." On the contrary, the court plainly stated that it was dismissing the punitive damages claim because, on the record presented, the requisite degree of culpability could not be established, notwithstanding the existence of a triable issue as to liability for compensatory damages.

I also note that the majority's appeal to the consequences of the alleged wrongdoing as grounds for sustaining the punitive damages claim is misguided. "[T]he purpose of punitive damages is solely to punish the offender and to deter similar conduct on the part of others," and such damages "are not intended to compensate or reimburse the plaintiff" (*Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 316 [1994] [citations omitted]). Thus, the existence of a legally cognizable claim for punitive damages depends solely on whether the defendant's culpability could reasonably be found to rise to a level sufficiently high to warrant punitive damages. For this reason, the emphasis both plurality memoranda place on the various kinds of harm plaintiffs claim to have suffered as a result of adopting Anthony is misplaced in a discussion of the punitive damages issue.[6]

The main thrust of the majority's argument is that the portion of LWS's summary judgment motion seeking to strike the demand for punitive damages was premature. Apparently, it is the majority's view that a punitive damages demand is not

---

**6.** In addition, it is ironic that the majority, while dismissing the causes of action for breach of fiduciary duty and intentional infliction of emotional distress in part because such claims are asserted to circumvent the limitation on compensatory damages for wrongful adoption under *Juman* (254 AD2d at 74), allows the punitive damages claim, which plainly is asserted as an alternative vehicle for reaching the very same result. In essence, what the majority takes away from plaintiffs by dismissing the second and third causes of action, it gives back by allowing plaintiffs to seek punitive damages.

subject to pretrial dismissal on summary judgment on the ground that the defendant's culpability cannot reasonably be found to rise to the requisite level, i.e., "a criminal indifference to civil obligations" (*Rocanova*, 83 NY2d at 614).[7] This position is inconsistent with prior decisions of this Court that have granted summary judgment dismissing claims for punitive damages on the ground that, although there were triable issues as to liability, the evidence established that, as a matter of law, the level of culpability required for an award of punitive damages could not be proven at trial (*see Williams v Halpern*, 25 AD3d 467, 468 [2006] [dismissing punitive damages demand based on medical malpractice claim relating to hepatitis C, while sustaining punitive damages demand based on claim relating to hepatitis B]; *Rudolph v Jerry Lynn, D.D.S., P.C.*, 16 AD3d 261, 263 [2005]; *Wilson v City of New York*, 7 AD3d at 267; *Longo v Armor El. Co.*, 307 AD2d 848, 849-850 [2003]; *Munoz v Puretz*, 301 AD2d 382, 384-385 [2003]).

According to one of my colleagues, the question of the propriety of an award of punitive damages becomes "ripe for appellate review" only after such damages have been awarded at trial. This overlooks the obligation plaintiffs had to oppose the summary judgment motion with evidence sufficient to raise a triable issue on the punitive damages issue. Since plaintiffs—who have not claimed any need for additional discovery—were not entitled to wait until trial to come forward with such evidence, it makes little sense for us to defer until after an expensive and burdensome trial the determination of an issue that can be resolved as a matter of law on the present 1,900-page record. In any event, it appears that, in the event of a verdict for plaintiffs, the facts that would have the most bearing on the degree of LWS's culpability—what information it had, what it did and did not disclose to plaintiffs, and what consensus as to the propriety of such disclosure existed among adoption agencies at the time—are essentially undisputed.

Contrary to my colleague's further assertion, we need not "summarily resolve contested factual issues" in order to conclude that plaintiffs' claim for punitive damages should not be allowed to go forward. As discussed above, the uncontested facts of this case, while leaving room for a triable issue as to LWS's liability for compensatory damages on the underlying wrongful adoption claim, cannot, in my view, support a finding of a degree of culpability sufficiently high to support an award of punitive damages. Again, on this record, there is no dispute

---

**7.** Of course, the Third Department made precisely this kind of determination in *Jeffrey BB.*

concerning the relevant standard of practice among adoption agencies at the relevant time, nor is there any dispute that this standard then had support in the field of research psychiatry. The implication of the majority's position seems to be that almost any time a triable issue exists as to whether institutional conduct gives rise to tort liability, there also will be a triable issue as to punitive damages, should the plaintiff seek them. I do not believe that this is, or should be, the law.

For the foregoing reasons, I believe that we should hold that the evidence concerning LWS's initial nondisclosure at the time of Anthony's placement and adoption cannot support an award of punitive damages. Although plaintiffs also complain of certain postadoption conduct by LWS (the earliest instance of which occurred in 1970), such postadoption conduct cannot support an award of punitive damages, regardless of the level of culpability that can reasonably be assigned to such conduct. This is because this Court—recognizing that once an adoption has been completed, subsequent full disclosure cannot sever the tie between adoptive parents and adoptee—has held that "the operative facts [of a wrongful adoption claim] are those that occurred at and around the time of the . . . adoption" (*Juman v Louise Wise Servs.*, 3 AD3d 309, 310 [2004]).

In *Juman*, where the allegedly wrongful adoption took place in 1966, the adoptive parents sought to recover punitive damages for LWS's "alleged disregard of its disclosure obligations under Social Services Law § 373-a" after that statute was enacted in the 1980s (3 AD3d at 310). We unanimously held that the parents were not entitled to seek punitive damages on this basis, given that "[d]efendant's conduct subsequent to September 1983 [when section 373-a was enacted] is irrelevant to plaintiffs' wrongful adoption claim" (*id.*). It follows that LWS's alleged postadoption misconduct in this case—all of which, to reiterate, took place in 1970 or later, years after the 1962 adoption—is entirely irrelevant to the wrongful adoption cause of action, which, given our affirmance of the dismissal of plaintiffs' other causes of action, is the only surviving claim. Accordingly, since plaintiffs cannot seek punitive damages based on conduct that does not give rise to any viable substantive cause of action (*see Rocanova*, 83 NY2d at 616-617), they cannot invoke LWS's postadoption conduct as a basis for an award of punitive damages.

Even if LWS's postadoption conduct were relevant to the wrongful adoption claim—and, again, it is not—I do not believe that such conduct could reasonably be found to rise to a level of culpability high enough to justify an award of punitive damages.

As is the case with LWS's conduct at the time of the adoption, the record provides no basis for finding either that LWS's purpose in engaging in the postadoption conduct at issue was "to maliciously hurt" plaintiffs (*164 Mulberry St. Corp. v Columbia Univ.*, 4 AD3d at 60), or that such conduct betrayed "a criminal indifference to civil obligations" (*Rocanova*, 83 NY2d at 614). With regard to the last point, I note that the only two postadoption instances in which LWS gave incomplete responses to inquiries by plaintiffs about Anthony's background occurred in 1970 and 1973, long before Social Services Law § 373-a was enacted. Further, it is uncontroverted that, as attested by LWS's expert, the consensus among adoption agencies not to disclose information of the kind at issue continued to exist through the 1970s and into the early 1980s.

I further note that the plurality memoranda wrongly imply that, had plaintiffs known sooner about the mental illness in Anthony's family background, not only would his condition have been diagnosed earlier, plaintiffs somehow would have been able to avert or attenuate the future course of his illness, thereby avoiding the various misfortunes plaintiffs attribute to the impact of that illness. The record offers no support for this supposition, either in the affidavit of plaintiffs' medical expert or anywhere else. Moreover, once Anthony's illness progressed beyond its early stages, neither the plurality memoranda nor plaintiffs suggest any reason why a competent mental health professional would have required the family background information to make an accurate diagnosis.

In fact, the record (as plaintiffs themselves interpret it) demonstrates that, as far back as 1982, knowledge of Anthony's family background was *not* necessary to diagnose him as a paranoid schizophrenic. In June 1982, the 21-year-old Anthony unexpectedly turned up at the office of Dr. Anne-Marie Weil, a psychiatrist affiliated with LWS who had treated him for about a year in the early 1970s. According to notes in LWS's files, Dr. Weil, in a telephone call shortly after Anthony's 1982 visit, told LWS that she then "had no memory of having [previously] seen him," and, "if she had ever seen him, she had no record of his visits since she did not keep out-dated information on patients." Nonetheless, Dr. Weil reported to the LWS social worker that Anthony's "appearance and demeanor" upon his visit to her office that year were enough to give her the impression that "he was a paranoid schizophrenic, capable of violence." If Dr. Weil was able to diagnose Anthony as a potentially violent paranoid schizophrenic in June 1982 without remembering anything she had previously learned about him, I cannot see why any other

competent psychiatrist would have required information about the mental illness in Anthony's family background to render a similar diagnosis at that time. At any rate, I cannot see how plaintiffs can realistically blame LWS for their failure to obtain an accurate diagnosis of Anthony's condition for 33 years.[8]

By no means do I minimize what plaintiffs have suffered. The fate that befell them is indeed heartrending, and rightly evokes enormous sympathy from any person of good will. An adoption they hoped would enable them to experience the joy of parenthood turned into a nightmare, and they now seek recompense from the adoption agency that withheld information about the child's background. However, sustaining the demand for punitive damages in order to allow plaintiffs to pursue the maximum attainable recovery (and, perhaps, to extract a settlement that would not otherwise be forthcoming), while perhaps emotionally satisfying, is not, in my view, consistent with our duty to enforce the limitation of the availability of punitive damages to cases where the defendant may reasonably be found to have acted, not only tortiously, but out of "evil and reprehensible motives" (*Walker v Sheldon*, 10 NY2d at 404). On the record before us, plaintiffs simply will not be able to prove this high level of culpability, given that the conduct at issue clearly was motivated by a desire to find a good home for Anthony, and was entirely in accord with the standard of practice accepted among adoption agencies of the time. Accordingly, I would modify the order appealed from to grant LWS partial summary judgment striking the demand for punitive damages. To the extent the majority does otherwise, I respectfully dissent. [*See* 4 Misc 3d 279 (2004).]

---

**8.** In this regard, I observe that, in seeking a reason for the failure to diagnose the true nature of Anthony's illness until 1995 (when he was 34 years old), one might do well to consider that plaintiffs' schedule of expenses incurred on Anthony's behalf apparently does not reflect any payments for psychiatric or psychological services from 1982 (the year of his surprise visit to Dr. Weil) to 1993. This lengthy period during which Anthony evidently received no psychotherapy, in spite of his continuing disturbed behavior, may explain how it came to be that in 1994—the year before the diagnosis of paranoid schizophrenia was made—Mrs. Ross still believed that her son's problem was merely attention deficit/hyperactivity disorder.